**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma
Susan D. Pontoriero
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Attorneys for Plaintiff
[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAMES BENDRICK, Individually and On Behalf of All Others Similarly Situated, | **Civil Action No.** |
| Plaintiff, | |
| vs. | CLASS ACTION COMPLAINT |
| ARBINET-THEXCHANGE, INC., J. CURT HOCKEMEIER, JOHN J. ROBERTS, | |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, James Bendrick ("Plaintiff"), residing at 1857 McDaniel Avenue, San Jose, California 95126, alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arbinet-Thexchange, Inc. ("Arbinet" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the securities of Arbinet (the "Class") pursuant and/or traceable to the Company's Initial Public Offering ("IPO") on or about December 16, 2004 and between December 16, 2004, and June 21, 2005, and seeking to pursue remedies under the Securities Act of 1934 (the "Exchange Act").

2. Arbinet and subsidiaries operate an electronic market for trading, routing, and settling communications capacity.

3. The complaint alleges that defendants' Class Period representations regarding Arbinet were materially false and misleading when made for the following reasons: (1) that Arbinet was experiencing a shorter than average call duration and a mix shift to wireless calls from wired calls, which led to a decrease in the average number of minutes the Company transacted on the exchange; (2) that the Company due to credit problems was forced to suspend trading for two of its largest customers; (3) that the Company's international offerings were not adequately differentiated from its competitors, thereby jeopardizing Arbinet's ability to grow abroad; and (4) that a result of the foregoing, the defendant's positive statements about the Company's condition and progress lacked in all reasonable basis.

4. On June 21, 2002, Arbinet lowered its guidance for both the second quarter and all of 2005. On this news, shares of Arbinet fell $4.00 per share, or 34.78 percent, on June 22, 2005, to close at $7.50 per share.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

7. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

8. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff, James Bendrick, as set forth in the accompanying certification, incorporated by reference herein, purchased Arbinet securities at artificially inflated prices.

7. Defendant Arbinet is a Delaware corporation with its principal executive offices located at 120 Albany Street, Tower II, Suite 450, New Brunswick, New Jersey 08901.

8. Defendant J. Curt Hockemeier ("Hockemeier") was, at all relevant times, the Company's President, and Chief Executive Officer.

9. Defendant John J. Roberts ("Roberts") was, at all relevant times, the Company's Chief Financial Officer.

10. Defendants Hockemeier and Roberts are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Arbinet's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, who purchased shares of Arbinet pursuant and/or traceable to the Company's IPO on or about December 16, 2004 and between December 16, 2004, and June 21, 2005.

12. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Arbinet's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Arbinet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arbinet; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

16. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

17. Arbinet and subsidiaries operate an electronic market for trading, routing, and settling communications capacity. It offers voice, data, enhanced services, and information products and services. The Company's members of the exchange can anonymously buy and sell voice calls and Internet capacity. The Company's exchange-based trading system permits buyers and sellers to transact business in a liquid and open market.

18. On or about December 16, 2005, Arbinet filed with the SEC on Form S-1 Registration Statement (the "Registration Statement") for the IPO. Also, on or about December 16, 2004, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, (the Prospectus and Registration Statement are collectively referred to as the "Registration Statements") became effective and 6,535,405 shares of Arbinet's common stock were sold to the public resulting in gross proceeds of $114,369,587.

19. In the Company's Registration Statements, Arbinet represented:

> Overview
>
> We are the leading electronic market for trading, routing and settling communications capacity. Members of our exchange, consisting primarily of communications services providers, anonymously buy and sell voice calls and Internet capacity through our centralized, efficient and liquid marketplace. Communications services providers that do not use our exchange generally individually negotiate and buy access to the networks of other communications services providers to send voice calls and

Internet capacity outside of their network. We believe that we provide a cost-effective and efficient alternative to these direct connections. With a single interconnection to our exchange, members have access to all other members' networks. Members place orders through our easy-to-use web-based interface. Sellers on the exchange post sell orders to send voice calls and Internet capacity for specific destinations, or routes, at various prices. We independently assess the quality of these routes and include that information in the sell order. Buyers enter buy orders based on route quality and price and are matched to sell orders by our fully automated trading platform and our proprietary software. When a buyer's order is matched to a seller's order, the voice calls or Internet capacity are then routed through our state-of-the-art facilities. We invoice and process payments for our members' transactions and manage the credit risk of buyers primarily through our credit management programs with third parties.

Through our exchange, members have access to communications capacity in every country in the world. Our exchange has achieved increased liquidity, as we have continued to add new members and experience growth in the number of minutes of wireline and wireless voice calls traded on our exchange through both traditional communications networks and voice over Internet protocol, or VoIP, facilities. As of September 30, 2004, we had 343 members who subscribed to our voice trading services, including eight of the world's ten largest communications services providers.

***

In July 2004, we launched products and services that allow the trading of Internet capacity through our exchange. As of September 30, 2004, we had 25 members who subscribed to our Internet data trading services. In September 2004, we acquired the Internet protocol trading exchange business of Band-X Limited, or Band-X, with operations located in New York, London, and Edinburgh, Scotland for $4.0 million in cash, subject to certain working capital adjustments. As part of our acquisition, 195 former Band-X customers became our customers and nine former Band-X suppliers became our suppliers. We are in the process of establishing direct contractual relationships with these customers and suppliers. We believe many of such customers and suppliers will become members of our exchange. We believe the acquisition will accelerate the growth of our exchange for Internet capacity.

***

We have grown, and believe we will be able to continue to grow, fee revenues significantly faster than these operating costs and expenses. For example, these costs and expenses increased approximately 10% from $25.1 million for the nine months ended September 30, 2003 to $27.7 million for the nine months ended September 30, 2004, and our fee revenue grew approximately 29% over the same period.

Industry Overview

The global communications services industry continues to evolve, providing significant opportunities and creating competitive pressures for market participants. The industry has been experiencing significant changes, including the proliferation of wireless and data products and services, increased voice and data volume, declining unit pricing and the emergence of new participants due to deregulation and low-cost technologies. The growth in competition and associated fragmentation along with declining unit pricing and an industry structure that is characterized by high fixed costs have resulted in increased pressure on communications services providers' profitability. Most communications services providers must access other providers' networks to send and receive voice and data traffic. The process of establishing, managing and maintaining these interconnections is labor-intensive, costly, time-consuming and highly negotiated, which leads to higher installation, network management, selling, legal, billing and collection costs, creating the need and demand for a centralized and efficient marketplace.

Our Solution

We have created a global market where our members, through a single interconnection to our facilities, trade, route and settle voice calls and Internet capacity. Our exchange is neutral, favoring neither buyer nor seller, and allows our members to trade anonymously. Our system incorporates the following processes and attributes:

Trade

On our exchange, members can buy communications capacity to

every country in the world. Our members place orders based on quality and price criteria, through our easy-to-use, web-based trading platform. We independently monitor and update the route quality rating of our sellers. We provide our members with market quality, price and volume information that helps them trade effectively on our exchange.

Route

Our proprietary software and patented processes automatically match and prioritize the orders based on the quality and price parameters that our members place on our exchange. Traffic is automatically routed from the buyer to the seller based on this order prioritization.

Settle

We manage all of the clearing, settlement and credit risk management for our members. Our members receive a single invoice from us that reflects the net amount due to or from us. We also manage the credit risk of transactions executed on our exchange through third-party financing arrangements, prepayment programs, cash deposits and letters of credit. This enables us to pay our sellers regardless of whether we have collected payment from the buyers.

The Benefits of our Solution to our Exchange Members

Our exchange provides many benefits to our members. By trading, routing and settling voice calls and Internet capacity through our exchange, members can access multiple buyers and sellers, increase network utilization, achieve better pricing and improve profitability and cash flow by reducing the number of interconnections, reducing selling, legal, billing and collection expenses and eliminating disputes and bad debt.

Benefits of a single interconnection.

• By establishing a single interconnection to one of our five exchange delivery points, or EDPs, and executing a standard membership agreement with us, communications services providers gain immediate targeted access to and a link with several hundred buyers and sellers. This replaces the lengthy, costly and highly negotiated process of searching for and interconnecting to

other communications services providers on a one-to-one basis and managing each interconnection on an ongoing basis. Furthermore, by aggregating traffic through a single interconnection to our exchange, we believe that our members can improve their network utilization by increasing the traffic they buy and sell through their existing infrastructure.

• Benefits of our trading platform and automatic routing. We believe our buyers are able to lower their costs at their specified quality criteria for voice calls and Internet capacity because buyers have access to quality and price data of numerous sellers. We eliminate the need for buyers to independently assess the quality of each seller's network by providing a centralized and up-to-date source of quality rating of sellers' routes, enabling buyers to make quality comparisons between sellers' routes.

• Benefits of our settlement and credit risk management features. Our settlement procedures are standardized and centralized. We handle all invoicing for voice calls and Internet capacity sold on our exchange. Members receive a single payment or invoice from us reflecting net buying or selling activity on our exchange. This settlement reduces members' administrative costs and improves their working capital. We eliminate bad debt exposure for sellers because we assume the credit risk of every transaction executed on our exchange. We pay our sellers regardless of whether we have collected payment from the buyers. We manage our credit risk through the netting of our members' buying and selling activity, third-party financing arrangements, prepayment programs, cash deposits and letters of credit. We believe our standard settlement terms accelerate the payment and improve cash flow for our sellers.

Our Strategy

Our mission is to provide the trading platform where virtually any digital good can be traded. The key elements of our strategy are:

Expand our voice business through the following initiatives:

• Increase participation on our exchange from existing members. We believe our members benefit from economies of scale as they send more voice calls through our exchange allowing them to further reduce their expenses and reallocate resources. By demonstrating the cost savings of our

exchange to senior management of our members, we believe members will increase their participation on our exchange.

- Increase membership on our exchange. We intend to continue to add members to our exchange in order to increase liquidity and volume. We are focusing our sales and marketing efforts on incumbent national carriers, regional Bell operating companies and competitive communications services providers in deregulated markets in the United States, Western Europe, Asia and Latin America. Additionally, we are focusing our sales efforts on communications services providers that we believe are best positioned to add market share as minutes shift to wireless and VoIP, including European and Asian wireless communications services providers, cable companies and VoIP service providers. As our membership increases, we expect the network effect of our exchange to attract even more buyers and sellers, which will further increase liquidity.

- Expand our global presence. We currently have EDPs in New York, Los Angeles, London, Frankfurt and Hong Kong. We plan to expand our presence in the high-growth markets of Asia and Latin America.

- Develop, market and expand complementary services. We plan to develop, market and expand services that are complementary to our existing offerings, including enhanced trading, credit and clearing services and switch partitioning.

Leverage our trading platform, intellectual property and operations support systems to offer a trading platform for other digital goods. We believe that we can leverage our web-based trading platform, intellectual property portfolio and operations support systems to allow for the trading, routing and settlement of other digital goods and offer additional services. In July 2004, we launched an automated full service web-based trading platform for Internet capacity. Internet capacity can be bought or sold on our exchange in a manner similar to our voice offerings. Members are able to enter orders with quality and price specifications. We deliver the capacity over our proprietary platform and handle all billing and settlement functions. We currently have 25 members on our exchange for Internet capacity. In September 2004, we acquired the Internet protocol trading exchange business of Band-X Limited, with operations located in New York, London and Edinburgh, Scotland for $4.0 million in cash, subject to certain

> working capital adjustments. As part of our acquisition, 195 former Band-X customers became our customers and nine former Band-X suppliers became our suppliers. We are in the process of establishing direct contractual relationships with these customers and suppliers. We believe many of such customers and suppliers will become members of our exchange.

20. The Company's Registration Statements also included a discussion of potential risks to Arbinet's profitability and operating results:

> **Risks Relating to Our Business**
>
> **We have a limited operating history as a company and as an exchange for communications services providers. If we are unable to overcome the difficulties frequently encountered by early stage companies, our business could be materially harmed**.
>
> We began our operations in November 1996. In October 1999, we discontinued some of our previous operations, which involved the sale and rental of telecommunication equipment and operating international routes, and modified our business strategy to focus exclusively on our Internet-based exchange for long-distance voice calls. In the second quarter of 2004, we introduced our exchange-based system for buying and selling Internet capacity.
>
> We have experienced, and expect to continue to experience, risks and difficulties frequently encountered by companies in an early stage of commercial development in new and rapidly evolving markets. In order to overcome these risks and difficulties, we must, among other things:
>
> - generate sufficient usage of our exchange by our members;
> - maintain and attract a sufficient number of members to our exchange to achieve and sustain profitability;
> - execute our business strategy successfully, including successful execution of our Internet capacity business;
> - manage our expanding operations; and

- upgrade our technology, systems and network infrastructure to accommodate increased traffic and transaction volume and to implement new features and functions.

Our failure to overcome these risks and difficulties and the risks and difficulties frequently encountered by early stage companies could impair our ability to raise capital, expand our business or continue our operations.

**We have incurred a cumulative loss since inception and if we do not maintain or generate significant revenues, we may not remain profitable.**

We have incurred significant losses since our inception in November 1996. At September 30, 2004, our accumulated deficit was approximately $105.1 million. Although we achieved net income of $1.9 million in the first nine months of 2004, we expect to incur significant future expenses, particularly with respect to the development of new products and services, deployment of additional infrastructure and expansion in strategic global markets. To remain profitable, we must continue to increase the usage of our exchange by our members and attract new members in order to improve the liquidity of our exchange. We must also deliver superior service to our members, mitigate the credit risks of our business and develop and commercialize new products and services. We may not succeed in these activities and may never generate revenues that are significant or large enough to sustain profitability on a quarterly or annual basis. A large portion of our fee revenues is derived from fees that we charge our members on a per-minute and per-megabyte basis. Therefore, a general market decline in the price for voice calls and Internet capacity may adversely affect the fees we charge our members in order to keep or increase the volume of member business and could materially impact our future revenues and profits.

Our failure to remain profitable would depress the market price of our common stock and could impair our ability to expand our business, diversify our product and service offerings or continue our operations.

**Our members may not trade on our exchange or utilize our other services due to, among other things, the lack of a liquid market, which may materially harm our business. Volatility in trading volumes may have a significant adverse effect on our**

**business, financial condition and operating results.**

Traditionally, communications services providers buy and sell network capacity in a direct, one-to-one process. Our members may not trade on our exchange unless it provides them with an active and liquid market. Liquidity depends upon the number of buyers and sellers that actively trade on a particular communications route. Our ability to increase the number of buyers that actively trade on our exchange will depend on, among other things, the willingness and ability of prospective sellers to satisfy the quality criteria imposed by prospective buyers, and upon the increased participation of competing sellers from which a buyer can choose in order to obtain favorable pricing, achieve cost savings and consistently gain access to the required quality services. Our ability to increase the number of sellers that actively trade on our exchange will depend upon the extent to which there are sufficient numbers of buyers available to increase the likelihood that sellers will generate meaningful sales revenues. Alternatively, our members may not trade on our exchange if they are not able to realize significant cost savings. This may also result in a decline in trading volume and liquidity of our exchange. Declines in the trading volume on our exchange will result in lower revenues to us and would adversely affect our profitability because of our predominantly fixed cost structure. Volatility in trading volumes may have a significant adverse effect on our business, financial condition and operating results.

**Our members may not trade on our exchange, because such members may conclude that our exchange will replace their existing business at lower margins.**

If our exchange continues to be an active, liquid market in which lower-priced alternatives are available to buyers, sellers may conclude that further development of our exchange will erode their profits and they may stop offering communications capacity on our exchange. Since our exchange provides full disclosure of prices offered by participating sellers, on an anonymous basis, buyers may choose to purchase network capacity through our exchange instead of sending traffic to their existing suppliers at pre-determined, and often higher, contract prices. If suppliers of communications capacity fear or determine that the price disclosure and spot market limit order mechanisms provided by our exchange will “cannibalize” the greater profit-generating potential of their existing business, they may choose to withdraw

from our exchange, which ultimately could cause our exchange to fail and materially harm our business.

**Our member enrollment cycle can be long and uncertain and may not result in revenues.**

Our member enrollment cycle can be long, and may take up to 12 months or even longer from our initial contact with a communications services provider until that provider signs our membership agreement. Because we offer a new method of purchasing and selling long-distance voice calls and Internet capacity, we must invest a substantial amount of time and resources to educate services providers regarding the benefits of our exchange. Factors that contribute to the length and uncertainty of our member enrollment cycle and that may reduce the likelihood that a member will purchase or sell communications traffic through our exchange include:

the strength of pre-existing one-to-one relationships that prospective members may already have with their communications services providers;

- existing incentive structures within our members' organizations that do not reward decision-makers for savings achieved through cost-cutting;

- the experience of the trial trading process by prospective members; and

- any aversion to new methods for buying and selling communications capacity.

If we fail to enroll new members, we may not increase our revenues which would adversely affect our business, financial condition and results of operations.

**Until recently, our operations have been cash flow negative and we have depended on equity financings and credit facilities to meet our cash requirements, which may not be available to us in the future on favorable terms, if at all. We may require substantial additional funds to execute our business plan and, if additional capital is not available, we may need to limit, scale back or cease our operations.**

Until the year ended December 31, 2002, we experienced negative operating cash flow and have depended upon equity financings, as well as borrowings under our credit facilities, to meet our cash requirements in each quarterly and annual period since we began our operations in November 1996. We expect to meet our cash requirements for the next 12 months through a combination of cash flow from operations, existing cash, cash equivalents and short-term investments, borrowings under our credit facilities and net proceeds from this offering. If our cash requirements vary materially from those currently planned, or if we fail to generate sufficient cash flow from our business, we may require additional financing sooner than anticipated.

Our current credit facility with Silicon Valley Bank expires in May 2006. We may default under this facility or may not be able to renew this credit facility upon expiration or on acceptable terms. In addition, we may seek additional funding in the future and intend to do so through public or private equity and debt financings. We also could be required to seek funds through arrangements with collaborators or others that may require us to relinquish rights to some of our technologies, product or service candidates or products or services which we would otherwise pursue on our own. Additional funds may not be available to us on acceptable terms or at all. If we are unable to obtain funding on a timely basis, we may not be able to execute our business plan. As a result, our business, results of operations and financial condition could be adversely affected and we may be required to significantly curtail or cease our operations.

**Our settlement procedures subject us to financial risk on all receivables not accepted by GMAC or Highbridge under our credit arrangements or covered by our other methods of managing our credit risk. In addition, we may elect to forego potential revenues to avoid certain credit risks.**

Under our settlement procedures, we pay a seller on our exchange the net sales price, or the total amount sold by a member less the amount purchased by that member in a given period, for its trading activity. We may not, however, collect the net sales price from the buyers on our exchange until after we have paid the sellers. We have established credit risk assessment and credit underwriting services with each of GMAC and SCM Telco Finance, or SCM Telco, that provide us with a level of credit risk protection. In August 2004, SCM Telco assigned our credit agreement to

Highbridge/Zwirn Special Opportunity Fund, LP, or Highbridge, who assumed all of SCM Telco's obligations under the credit agreement. We are subject to financial risk for any nonpayment by our buyers for receivables that GMAC and/or Highbridge do not accept. We seek to mitigate that risk by evaluating the creditworthiness of each buyer prior to its joining our exchange, as well as requiring either deposits, letters of credit or prepayments from our buyers. We also manage our credit risk by reducing the amount owed to us by our buying members by netting the buy amount and the sell amount for each member on our exchange. In the third quarter of 2004, approximately 98% of our trading revenues were covered by GMAC and Highbridge credit lines, netting, prepayments or other cash collateral, of which 46% were covered by GMAC and Highbridge credit lines. However, our credit evaluations cannot fully determine whether buyers can or will pay us for capacity they purchase through our exchange. In the future, we may elect to increase the amount of credit we extend to our customers we deem creditworthy in order to reduce our credit underwriting costs. If buyers fail to pay us for any reason and we have not been able or have elected not to secure credit risk protection with respect to these buyers, our business could be adversely affected. In the event that the creditworthiness of our buyers deteriorates, our credit providers and we may elect not to extend credit and consequently we may forego potential revenues that could materially affect our results of operations.

**We may not be able to find a replacement for GMAC or Highbridge which could materially harm our business.**

We currently rely on GMAC and Highbridge to bear a significant portion of the credit risk exposure to us with respect to transactions executed on our exchange. Our credit risk agreement with GMAC expires in February 2005. Although we have an alternative arrangement with Highbridge to provide supplemental credit risk protection, if we cannot renew our contract with GMAC at the end of its term, if GMAC terminates the contract upon an event of default or if we are unable to identify a suitable alternative credit risk provider on acceptable terms, we may be unable to mitigate the credit risk associated with our business. Our agreement with Highbridge expires on December 12, 2005. Additionally, the agreement is terminable upon 60 days' notice, with a $250,000 termination fee, if the agreement is cancelled by us in the first year. In the third quarter of 2004, approximately 46% of our trading revenues were covered by GMAC and Highbridge credit

lines. The failure to find a replacement for either GMAC or Highbridge on terms acceptable to us, if at all, could subject us to significant losses and materially harm our business.

**We are exposed to the credit risk of our members not covered by our credit management programs with third parties which could result in material losses to us.**

There have been adverse changes in the public and private equity and debt markets for communications services providers that have affected their ability to obtain financing or to fund capital expenditures. In some cases, the significant debt burden carried by certain communications services providers has adversely affected their ability to pay their outstanding balances with us and some of our members have filed for bankruptcy as a result of their debt burdens, making us an unsecured creditor of the bankrupt entity. Although these members may emerge from bankruptcy proceedings in the future, a bankruptcy proceeding can be a slow and cumbersome process and creditors often receive partial or no payment toward outstanding obligations. Furthermore, because we are an international business, we may be subject to the bankruptcy laws of other nations which may provide us limited or no relief. Even if these members should emerge from bankruptcy proceedings, the extent and timing of any future trading activity is uncertain.

In addition, because we generally pay the sellers on our exchange and then seek payment from the buyers on our exchange, a bankruptcy court may require us to return the funds received from a buyer if we, and not our sellers, are deemed to have received a preferential payment prior to bankruptcy. Although we have credit risk programs in place to monitor and mitigate the associated risks, including our arrangements with GMAC and Highbridge and our policy of netting a member’s buy and sell transactions on our exchange, we do not always utilize these programs for certain members and, in such instances, these programs are not effective in eliminating or reducing these credit risks to us.

We have experienced losses due to the failure of some of our members to meet their obligations and then subsequently seeking protection of applicable bankruptcy laws. Although these losses have not been significant to date, future losses, if incurred, could be significant and could harm our business and have a material adverse effect on our operating results and financial condition.

**If we are not able to retain our current senior management team or attract and retain qualified technical and business personnel, our business will suffer.**

We are dependent on the members of our senior management team, in particular, J. Curt Hockemeier, our President and Chief Executive Officer, for our business success. Our employment agreements with Mr. Hockemeier and our other executive officers are terminable on short notice or no notice. We do not carry key man life insurance on the lives of any of our key personnel. The loss of any of our executive officers would result in a significant loss in the knowledge and experience that we, as an organization, possess and could significantly affect our current and future growth. In addition, our growth will require us to hire a significant number of qualified technical and administrative personnel. There is intense competition from numerous communications services companies for human resources, including management, in the technical fields in which we operate, and we may not be able to attract and retain qualified personnel necessary for the successful operation and growth of our exchange. The loss of the services of key personnel or the inability to attract new employees when needed could severely harm our business.

**The market for our services is competitive and if we are unable to compete effectively, our financial results will suffer.**

We face competition for our voice trading services from communications services providers' existing and established legacy processes and new companies that may be able to create centralized trading solutions that replicate our voice trading platform or circumvent our intellectual property. These companies may be more effective in attracting voice traffic than our exchange.

We face competition for our data trading services from Internet service providers and Internet capacity resellers. In addition, software-based, Internet infrastructure companies focused on Internet protocol route control products may compete with us for business. Furthermore, Internet network service providers may make technological advancements, such as the introduction of improved routing protocols to enhance the quality of their services, which could negatively impact the demand for our data services.

Some of our current and potential competitors may have greater financial resources than we do and may have the ability to adopt

aggressive pricing policies. In addition, many of these companies have longer operating histories and may have significantly greater technical, marketing and other resources than we do and may be able to better attract the same potential customers that we are targeting. Once customers have established business relationships, it could be extremely difficult to convince them to utilize our exchange or replace or limit their existing ways of conducting business.

We expect competition to intensify in the future, and we may not have the financial resources, technical expertise, sales and marketing abilities or support capabilities to compete successfully. Our competitors may be able to develop services or processes that are superior to our services or processes or that achieve greater industry acceptance or that may be perceived by buyers and sellers as superior to ours.

**Future governmental regulations may adversely affect our business.**

The communications services industry is highly regulated in the United States and in foreign countries. Our business may become subject to various United States, United Kingdom and other foreign laws, regulations, agency actions and court decisions. The Federal Communications Commission, or FCC, has jurisdiction over interstate and international communications in the United States. The FCC currently does not regulate the services we offer. If, however, the FCC determined, on its own motion or in response to a third party's filing, that it should regulate our services and that certain of our services or arrangements require us to obtain regulatory authorizations, the FCC could order us to make payments into certain funds supported by regulatory entities, require us to comply with reporting and other ongoing regulatory requirements and/or fine us. We are currently not regulated at the state level, but could be subjected to regulation by individual states as to services that they deem to be within their jurisdiction.

In addition, like many businesses that use the Internet to conduct business, we operate in an environment of tremendous uncertainty as to potential government regulation. We believe that we are not currently subject to direct regulation of the services that we offer other than regulations generally applicable to all businesses. However, governmental agencies have not yet been able to adapt all existing regulations to the Internet environment. Laws and

regulations may be introduced and court decisions reached that affect the Internet or other web-based services, covering issues such as member pricing, member privacy, freedom of expression, access charges, content and quality of products and services, advertising, intellectual property rights and information security. In addition, because we offer our services internationally, foreign jurisdictions may claim that we are subject to their regulations. Any future regulation may have a negative impact on our business by restricting our method of operation or imposing additional costs. Further, as a company that conducts a portion of our business over the Internet, it is unclear in which jurisdictions we are actually conducting business. Our failure to qualify to do business in a jurisdiction that requires us to do so could subject us to fines or penalties, and could result in our inability to enforce contracts in that jurisdiction.

Any of these government actions could have a material adverse effect on our business.

**Expanding and maintaining international operations will subject us to additional risks and uncertainties.**

We expect to continue the expansion of our international operations, which will subject us to additional risks and uncertainties. Although we have established EDPs in New York City, Los Angeles, London, Frankfurt and Hong Kong, we intend to expand our presence in the markets of Asia and Latin America. Foreign operations are subject to a variety of additional risks that could have an adverse effect on our business, including:

- difficulties in collecting accounts receivable and longer collection periods;

- changing and conflicting regulatory requirements;

- potentially adverse tax consequences;

- tariffs and general export restrictions;

- difficulties in integrating, staffing and managing foreign operations;
- political instability;

- seasonal reductions in business activity during the

summer months in Europe and certain other parts of the world;

- the impact of local economic conditions and practices;
- potential non-enforceability of our intellectual property and proprietary rights in foreign countries; and
- fluctuations in currency exchange rates.

Our inability to manage these risks effectively could adversely affect our business, financial condition and operating results.

**If we are unable to establish new EDPs, or do not adequately control expenses associated with the establishment of new EDPs, our results of operations could be adversely affected.**

As part of our expansion strategy, we intend to establish new EDPs, particularly in new geographic markets. We will face various risks associated with identifying, obtaining and integrating attractive EDP sites, cost estimation errors or overruns, interconnection delays, material delays or shortages, our inability to obtain necessary permits on a timely basis, if at all, and other factors, many of which are beyond our control and all of which could delay the establishment of any new EDP. We may not be able to establish and operate new EDPs on a timely or profitable basis. Establishment of new EDPs will increase our operating expenses, including expenses associated with hiring, training, retaining and managing new employees, purchasing new equipment, implementing new systems and incurring additional depreciation expense. If we are unable to control our costs as we establish additional EDPs and expand in geographically dispersed locations, our results of operations could be adversely affected.

**The future market for web-based trading of Internet capacity, and therefore the revenues of our data business, cannot be predicted with certainty.**

We face the risk that the market for web-based trading of Internet capacity might develop more slowly or differently than we currently anticipate, if at all. In addition, if the Internet becomes subject to a form of central management, or if Internet network service providers establish an economic settlement arrangement regarding the exchange of traffic between Internet networks, the demand for web-based trading of Internet capacity could be

adversely affected.

Even if the market for web-based trading of Internet capacity develops, our data service offerings may not achieve widespread acceptance. We may be unable to successfully and cost-effectively market and sell the services we offer to a sufficiently large number of members. In addition, a number of communications services providers and Internet service providers have been offering or expanding their network services, and the ability of these providers to bundle other services and products with their network services could place us at a competitive disadvantage. The failure of a significant market for web-based trading of Internet capacity to develop or the inability to increase membership in our data business could materially affect our revenues and, consequently, the results of our operations.

**Acquisitions, including our acquisition of the Internet protocol trading exchange business of Band-X, present many risks, and we may not realize the anticipated financial and strategic goals of any of our acquisitions.**

We may in the future acquire complementary companies, products and technologies. Such acquisitions, including the Band-X acquisition, involve a number of risks, which may include the following:

- we may find that the acquired company or assets do not further our business strategy, or that we overpaid for the company or assets, or that economic conditions have changed, all of which may result in a future impairment charge;

- we may have difficulty integrating the operations and personnel of the acquired business and may have difficulty retaining the customers and/or the key personnel of the acquired business;

- we may have difficulty incorporating and integrating acquired technologies into our business;

- we may face patent infringement risks associated with the sale of the acquired company's products;

- our ongoing business and management's attention may be disrupted or diverted by transition or integration issues and

the complexity of managing diverse locations;

- we may have difficulty maintaining uniform standards, controls, procedures and policies across locations;

- an acquisition may subject us to additional telecommunications regulations;

- an acquisition may result in litigation from terminated employees of the acquired business or third parties; and

- we may experience significant problems or liabilities associated with technology and legal contingencies of the acquired business.

These factors could have a material adverse effect on our business, results of operations and financial condition or cash flows, particularly in the case of a larger acquisition or multiple acquisitions in a short period of time. From time to time, we may enter into negotiations for acquisitions that are not ultimately consummated. Such negotiations could result in significant diversion of management time from our business as well as significant out-of-pocket costs.

In September 2004, we acquired the Internet protocol trading exchange business of Band-X Limited. In connection with the acquisition of the IP trading exchange business of Band-X, Band-X assigned or otherwise transferred to us the contracts of all 196 of its customers and its nine suppliers of Internet capacity. We believe many of such customers and suppliers will become members of our exchange. If we fail to successfully integrate this business or fail to obtain or retain the Band-X customers or suppliers, we may not achieve the intended benefits of this acquisition, including any increase in our revenues and profitability.

The consideration that we pay in connection with an acquisition could affect our financial results. If we were to proceed with one or more significant acquisitions in which the consideration included cash, we could be required to use a substantial portion of our available cash, including the proceeds of this offering, to consummate such acquisitions. To the extent we issue shares of stock or other rights to purchase stock, including options or other

> rights, our existing stockholders may experience dilution in their share ownership in our company and their earnings per share may decrease. In addition, acquisitions may result in the incurrence of debt, large one-time write-offs (such as of acquired in-process research and development costs) and restructuring charges. They may also result in goodwill and other intangible assets that are subject to impairment tests, which could result in future impairment charges. Any of these factors may materially and adversely affect our business and operations.

**Post IPO Staments**

21. On February 17, 2005, Arbinet issued a press release entitled "Arbinet Announces 2004 Financial Results." Therein, the Company, in relevant part, stated:

> Arbinet-thexchange, Inc. (Nasdaq: ARBX), the world's leading electronic market for trading, routing, and settling communications capacity, reported record financial results for its fourth quarter and full year ended December 31, 2004.
>
> Fourth quarter 2004 fee revenues were $12.5 million, an increase of 41% over the $8.9 million in the fourth quarter 2003. Fourth quarter 2004 net income was $6.0 million, an increase of 350% over the $1.3 million in the fourth quarter 2003. The fourth quarter 2004 included a charge for litigation settlement and related legal expenses of $3.4 million and a one-time gain of $7.2 million and non-cash interest expense of $0.4 million associated with a series of preferred stock that was redeemed in connection with Arbinet's December 2004 initial public offering. Fourth quarter adjusted net income was $2.5 million, an increase of 89% over the $1.3 million in the fourth quarter 2003.
>
> For the full year 2004, Arbinet generated fee revenues of $44.7 million, an increase of 32% over the $34.0 million in 2003. Full year net income was $7.9 million, compared to a five thousand dollar net loss in 2003. Full year 2004 adjusted net income was $6.5 million, compared to a five thousand dollar adjusted net loss in 2003.
>
> "Our strong fourth quarter results highlight Arbinet's solid growth throughout the year," said Curt Hockemeier, Arbinet's president and chief executive officer. "Communications providers' desire to better manage operating costs and improve margins continues to

> create a strong value proposition for our services as well as new services in development. I am proud of what the Arbinet team has accomplished in 2004 and I look forward to working with our team to deliver the best value we can for all of our members around the world in 2005."

22. On May 4, 2004, Arbinet issued a press release entitled "Arbinet Announces First Quarter 2005 Financial Results." Therein, the Company, in relevant part, stated:

> Arbinet-thexchange, Inc. (Nasdaq: ARBX), the world's leading electronic market for trading, routing, and settling communications capacity, reported financial results for its first quarter ended March 31, 2005.
>
> First quarter 2005 fee revenues were $12.3 million, an increase of 22% over the $10.1 million in the first quarter 2004. First quarter 2005 net income was $1.3 million, an increase of 55% over the $0.8 million in the first quarter 2004. Arbinet Members bought and sold 3.0 billion minutes on Arbinet's marketplace in the first quarter of 2005, up 28% from 2.4 billion minutes in the first quarter 2004.
>
> "Arbinet's growth has historically occurred in step functions as market supply and demand adjust," said Curt Hockemeier, Arbinet president and chief executive officer. "Our first quarter results were flat compared to the fourth quarter, but our fourth quarter results were at the high end of our historical quarterly growth rates. Over the past three years our quarter-over-quarter minutes growth has varied based on the liquidity in thexchange and our long-term growth has remained strong."
>
> The Company enjoyed record trading volume in March when Members bought and sold 1.106 billion minutes and April volume was 34% ahead of April, 2004 volume. Arbinet reaffirms its 2005 outlook of fee revenues within a range of $58 million to $64 million and net income within a range of $19 million to $23 million.

23. The statements referenced above in ¶¶ 19-22 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others: (1) that Arbinet was experiencing a shorter than average call duration and a mix

shift to wireless calls from wired calls, which led to a decrease in the average number of minutes the Company transacted on the exchange; (2) that the Company due to credit problems was forced to suspend trading for two of its largest customers; (3) that the Company's international offerings were not adequately differentiated from its competitors, thereby jeopardizing Arbinet's ability to grow abroad; and (4) that a result of the foregoing, the defendant's positive statements about the Company's condition and progress lacked in all reasonable basis.

**<u>The Truth Begins to Emerge</u>**

24. On June 21, 2005, Arbinet issued a press release entitled "Arbinet Revises Full Year 2005 Outlook." Therein, the Company, in relevant part, stated:

> Arbinet-thexchange, Inc. (Nasdaq: ARBX), the world's leading electronic market for trading, routing and settling communications capacity, today announced revised outlook for the full year 2005.
>
> Over the last six weeks, Arbinet has experienced several changes in Member trading on its exchange. Specifically, Arbinet has experienced a shift in the mix of geographic markets traded by its Members. During the same period, there was an increase in the mobile traffic minutes traded on Arbinet's exchange. Traffic to some markets, like Mexico as an example, is characterized by long average call durations and ranges from twelve to nineteen minutes per call. This contrasts with the relatively shorter length of mobile calls, which frequently average fewer than three minutes per call. The combination of the shift in the traffic mix and increase in mobile minutes has led to a decrease in the average number of minutes per call transacted on Arbinet's exchange. As a result of the shift to shorter calls, minutes growth did not keep pace with the 30% growth in completed calls Arbinet experienced in the period January through May, 2005 compared with the same period of 2004. In addition, in May, two large buyers reduced their trading after their credit lines were suspended by Arbinet.
>
> Assuming these same trends for the remainder of 2005, the Company now expects that fee revenues for the full year 2005 will be in the range of $46 million -- $50 million, with net income in the range of $3 million -- $6 million.

Based on preliminary information, the Company expects fee revenues for the second quarter 2005 will be in the range of $11.0 million -- $11.5 million, with net income in the range of $0.5 million -- $1.0 million. Arbinet said it expects average daily completed calls in the second quarter will be the highest of any quarter in its history and through May, completed calls were 30% greater than the same period in 2004. The Company completed 591 million calls during the first five months of 2005 compared to 456 million for the comparable period of 2004. The average call duration on thexchange is expected to be 3.9 minutes per call in the second quarter of 2005, compared to 4.2 minutes per call in the second quarter of 2004 and 4.4 minutes per call in the first quarter of 2005.

The DirectAxcess(SM) branded trading service, introduced on May 17, is expected to represent 2% of average daily trading volume by the end of the second quarter. The average call duration for DirectAxcess(SM) has averaged 7.2 minutes in the second quarter, which is 85% more than the expected overall average call duration for the second quarter of 3.9 minutes.

Curt Hockemeier, President and Chief Executive Officer of Arbinet, commented, "While we are pleased that Arbinet achieved a record for average daily completed calls in April and May 2005, the average number of minutes per call transacted on thexchange declined due to a change in the mix of geographic markets traded and an increase in mobile traffic minutes traded by Members. Our exchange is a spot market and fluctuates with geographic shifts as certain regions are characterized by longer call durations than other regions. When there is a shift in the geographic mix it can have a sudden effect on the average number of minutes per call transacted. With regard to mobile traffic, this has been one of the fastest growing communications segments worldwide for the past few years. This is a primary focus for Arbinet and our exchange members. From a trend standpoint, mobile calls transacted are typically higher in volumes with shorter call durations. The record call volumes we achieved in April and May reflect this trend and Arbinet's increasing penetration of this segment."

"Overall, we remain positive about Arbinet's long-term growth prospects," continued Hockemeier. "Our confidence is based on continued demand for our exchange platform, the strength of our customer base -- which includes 9 of the world's 10 largest carriers -- the scalability of our model and Arbinet's growth opportunities

> globally. We are the leading provider establishing a new market. As such, we expect continued fluctuations as customer usage varies, mobile calls continue to grow as a percentage of our traffic and customers shift geographic market trading. With that said, we believe the growth of our DirectAxcess(SM) service, with its longer call durations, will combine with the overall growth in completed calls to stabilize longer term growth in the voice exchange business."

25. On this news, shares of Arbinet fell $4.00 per share, or 34.78 percent, on June 22, 2005, to close at $7.50 per share.

26. On July 25, 2005, Barron's published an article entitled "A Series of Unfortunate Events Pushes Arbinet Shares Down." The article, in relevant part, read:

> If Lemony Snicket wrote about stocks, he'd almost certainly be chronicling the sad tale of the awkwardly named company known as Arbinet-thexchange: This is one company that has suffered from a series of highly unfortunate events.
>
> ***
>
> In recent months, several unfortunate things happened. For one, Arbinet shocked the Street in early May when it missed Street expectations for its first-quarter earnings, cash flow and revenue-its first full quarter as a public company. Arbinet said its exchange experienced excessive demand which it could not meet, then provided incentives to sellers of telecommunications capacity, pushing down prices in the process. The stock -- which had already fallen about $10 a share from the first-day peak to just north of the IPO price -- fell another $4 or so, to around 14.
>
> Meanwhile, some analysts had begun to warn that things could get uglier still. On May 5, the day after the first-quarter earnings bomb, Tom Watts, an analyst at S.G. Cowen, downgraded the stock to a Sell. Among other things, he warned that shareholders faced the coming expiration of a lock-up agreement covering an astonishing 89% of Arbinet's outstanding shares, including those held by the various venture-capital funds that had invested $125 million in the company prior to the public offering, going back as far as 1999.

**The lockups ended at 11:59 p.m. on June 14. Earlier that day, the Palo Alto, Calif.-based venture-capital firm ComVentures notified investors in several of its venture funds that at 12:00 a.m. on June 15 it would distribute substantially all of its holdings in Arbinet to the fund's limited partners. ComVentures' various funds together were Arbinet's single largest investor, with 5.46 million shares, a combined 22.2% stake.**

As you might imagine, investors who were paying attention to the Arbinet story were itching to get out. On June 14, the stock had closed at 12.69. On June 15, the stock dropped to 12, as volume soared. Over the next four days, the stock gradually trickled lower, closing on June 21 at 11.50.

And then something else unfortunate happened.

After the close on June 21, Arbinet whiffed again, lowering its guidance for both the second quarter and all of 2005. For the full year, Arbinet dropped its projected fee revenue for the quarter from a range of $58 million-$64 million, to $46 million-$50 million. They cut net income guidance from an estimated $19 million-$23 million to just $3 million-$6 million.

The company had various explanations for the shortfall, including shorter average call duration, a mix shift to wireless calls from wired calls, and the loss of two customers due to credit concerns. The stock dropped another $4, to 7.50. That was most of the damage, at least until June 30, when Merrill Lynch analyst Gregory Smith finally got around to dropping his rating on the stock to Neutral, citing a need for "more clarity" on "the exact drivers of declining revenues." Lately, the stock is trading around 7.

The chronology of events raises some interesting questions. Given the magnitude by which Arbinet had to reset expectations, you have to wonder about the timing of the announcement. Suppose, for instance, that Arbinet's board had known the same information one week earlier, when the lockup was about to expire. **By issuing the earnings warning on June 21, instead of, say, June 14, Arbinet potentially saved millions of dollars for the limited partners of the funds, who received shares with the expiration of the lockup and immediately dumped them.**

> **It raises the question of when exactly Arbinet execs figured out that they had to change guidance. And when did the board find out? ComVentures' general partner Roland Van der Meer sits on the Arbinet board; it certainly would be interesting to know when he discovered Arbinet would have a shortfall.** Alas, an outside spokesman for Arbinet said the company would not comment on the situation, and Van der Meer did not respond to repeated requests for comment. And what about Merrill Lynch, which not only underwrote the Arbinet IPO but also helped facilitate the ComVentures distribution via the Merrill Lynch Venture Services Group? Merrill analyst Gregory Smith declined an interview request and a company spokesman did not respond to a request for comment.
> (Emphasis added.)

## SCIENTER ALLEGATIONS

27. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Arbinet, their control over, and/or receipt and/or modification of Arbinet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Arbinet, participated in the fraudulent scheme alleged herein.

## UNDISCLOSED ADVERSE FACTS

28. The market for Arbinet's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Arbinet's securities traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Arbinet securities relying upon the integrity of the market price of Arbinet's securities and market information relating to Arbinet, and have been damaged thereby.

29. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Arbinet's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

30. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Arbinet's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Arbinet and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

31. Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Plaintiff and the Class.

32. During the Class Period, Plaintiff and the Class purchased securities of Arbinet at artificially inflated prices and were damaged thereby. The price of Arbinet's common stock declined when the misrepresentations made to the market, and/or the information alleged herein to had been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**Applicability Of Presumption Of Reliance:**
**<u>Fraud-On-The-Market Doctrine</u>**

33. At all relevant times, the market for Arbinet securities was an efficient market for the following reasons, among others:

(a) Arbinet stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Arbinet filed periodic public reports with the SEC and the NASDAQ;

(c) Arbinet regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Arbinet was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

34. As a result of the foregoing, the market for Arbinet securities promptly digested

current information regarding Arbinet from all publicly-available sources and reflected such information in Arbinet's stock price. Under these circumstances, all purchasers of Arbinet securities during the Class Period suffered similar injury through their purchase of Arbinet securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

35. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Arbinet who knew that those statements were false when made.

## FIRST CLAIM
**Violation Of Section 10(b) Of**
**The Exchange Act Against And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

36. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37. During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Arbinet securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

38. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Arbinet securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

39. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Arbinet as specified herein.

40. These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Arbinet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Arbinet and its business operations

and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Arbinet securities during the Class Period.

41. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

42. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Arbinet's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

43. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Arbinet securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Arbinet's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Arbinet securities during the Class Period at artificially high prices and were damaged thereby.

44. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Arbinet was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Arbinet securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

45. By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

46. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. The Individual Defendants acted as controlling persons of Arbinet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

49. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

50. As set forth above, Arbinet and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 26, 2005 **LITE DEPALMA GREENBERG & RIVAS, LLC**

By: /s/ Joseph J. DePalma

Joseph J. DePalma
Susan D. Pontoriero
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Tamara Skvirsky
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**Attorneys for Plaintiff**

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is related to Grover v. Arbinet-Thexchange, Inc., et al., Civil Action No. 05-4404(JLL) and Schwartz v. Arbinet-Thexchange, Inc., et al., Civil Action No. 05-4444(JLL). Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: September 26, 2005

**LITE DEPALMA GREENBERG & RIVAS, LLC**

By: /s/ Joseph J. DePalma
Joseph J. DePalma
Susan D. Pontoriero
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 623-3000

G:\DePalma\Bendrick - Complaint.wpd